Daniel P. Struck, Bar No. 012377
Jamie D. Guzman, Bar No. 22095
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Telephone: (480) 420-1600
dstruck@strucklove.com
jguzman@strucklove.com

*Attorneys for Petitioner*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| CoreCivic of Tennessee,<br><br>                              Petitioner,<br><br>        v.<br><br>International Union, Security, Police and<br>Fire Professionals of America,<br>and its Local 825,<br><br>                              Respondents. | No.<br><br>**PETITION AND MOTION TO VACATE ARBITRATOR'S AWARD UNDER SECTION 301 OF THE LABOR MANAGEMENT RELATIONS ACT** |

CORECIVIC OF TENNESSEE (hereinafter "CoreCivic" or "Employer") petitions and moves to vacate the Arbitrator's December 11, 2020 Opinion and Award in the arbitration between CoreCivic and Respondents International Union, Security, Police and Fire Professionals, Local 825, pursuant to 9 U.S.C. § 6 and 29 U.S.C. § 185.

## JURISDICTION AND VENUE

This is a petition and motion to vacate an arbitration award issued under a collective bargaining agreement between the Parties. This Court has subject matter jurisdiction pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 and 28 U.S.C. § 1331.

The arbitration award at issue in this case was delivered to CoreCivic on December 11, 2020. This petition and motion is timely filed within ninety (90) days of said delivery as required by 9 U.S.C. § 12 and Arizona Revised Statutes Section 12-3023.

Venue is proper in the United States District Court for the District of Arizona because (a) the events giving rise to this dispute took place in Florence, Arizona and (b) the relevant collective bargaining agreement between the Parties is applicable to certain CoreCivic employees working within this District at the Employer's Florence, Arizona facility, and (c) the arbitration hearing took place at Florence, Arizona.  29 U.S.C. § 185(a), (c).

## MEMORANDUM OF POINTS AND AUTHORITY

## I.    FACTUAL BACKGROUND

CoreCivic operates the Central Arizona Florence Correctional Center in Florence, Arizona (hereinafter "CAFCC"), a facility of some 5,000 offender beds and approximately 1,000 staff, including 585 correctional[1] officers. (Exhibit A, p. 5.) CAFCC houses detainees pursuant to service contracts with the United States Marshal Service ("U.S. Marshal") and the United States Department of Homeland Security Immigration and Customs Enforcement ("ICE").

The Union is, and at all times relevant to this matter was, the National Labor Relations Board certified exclusive bargaining agent with respect to rates of pay, wages, hours of work, and other terms and conditions of employment for the full-time and regular part-time correctional officers employed by CoreCivic at CAFCC, including the Grievant in the underlying matter.

The arbitration award now subject to this petition and motion to vacate involves the Grievant's termination from employment at CAFCC as a correctional officer. CoreCivic discharged the Grievant because (a) he failed to perform required duties pertaining to close observation safety and welfare checks of a CAFCC at-risk detainee housed in the facility's Restricted Housing Unit ("RHU") on suicide precautions, and (b) he falsified four written

---

[1] The Collective Bargaining Agreement refers to officers at CAFCC as correctional officers, and this term is used herein to refer to the same for purposes of consistency. CAFCC, however, operates as a detention center for US Marshal pre- and post-conviction detainees, as well as US Immigration and Customs Enforcement detainees. Therefore, CAFCC officers are typically referred to as Detention Officers.

entries on official records in an attempt to cover up his failure to perform his suicide prevention related duties.

On or about September 10, 2017, CoreCivic and the Union entered into a collective bargaining agreement ("Agreement") that was in effect at all times relevant to this matter. A copy of the Agreement is attached to this Complaint as Exhibit B.

The Agreement expressly reserves to CoreCivic the right to take any action which, "in the sole and exclusive discretion" of the management team is deemed necessary to the safe operation of the facility. The only limitation on CoreCivic's sole discretion is if the action violates an express written term of the Agreement. (Exhibit B, Preamble.)

Bargaining unit personnel, such as the Grievant, are considered essential employees in terms of the safety and security of the detainees in the custody of CAFCC.  (Exhibit B, Article 23, Section 6.)

Article 7 of the Agreement addresses Management Rights expressly reserved by CoreCivic.  Under the terms of Article 7, except as specifically limited by the express written provisions of the Agreement itself, CoreCivic reserves, or is otherwise given, "the sole and exclusive discretion" and right to manage its business in such a manner as CoreCivic determines to be in its best interest.  (Exhibit B, Article 7, Section 1.)

The rights reserved by, and the discretion given to, CoreCivic include the right to:

a.     Discipline, suspend, or discharge bargaining unit employees for just cause (Exhibit B, Article 7, Section 1c); and

b.     Establish quality and work standards and to evaluate the performance of employees and take action consistent with the Agreement, in whole or in part, in consideration of such standards. (Exhibit B, Article 7, Section 1f.)

Article 16 of the Agreement, Discipline and Discharge, provides further clarity as to the Employer's expressly reserved rights and the discretion granted CoreCivic in terms of discipline. To wit:

a.     Discipline must be for just cause (Exhibit B, Article 16, Section 1);

b.     Discipline for a violation of any work rule set out in Agreement Appendix A meets the required just cause threshold standard (Exhibit B, Article 16, Section 1); and

c.     In the referenced Appendix A to Article 16, the Parties agreed the following infractions constitute just cause for discipline up to and including termination:

1)     Providing false, misleading, or incomplete information on CoreCivic forms, records, reports, or documents (Exhibit B, Appendix A 8);

2)     Engaging in conduct in violation of CoreCivic or facility Code of Ethics and Business Conduct (Exhibit B, Appendix A 2);

3)     Engaging in any conduct in violation of CoreCivic or facility safety policies, procedures, or regulations (Exhibit B, Appendix A 6);

4)     Incomplete, negligence, or careless inattention in the performance of duties, the failure to properly and completely perform assigned duties (Exhibit B, Appendix A 13); and

5)     Any act or omission that leads or could have resulted in danger or harm to any detainee. (Exhibit B, Appendix A 13.)

Under the terms of the Agreement, the sole discretion in setting the appropriate disciplinary penalty for any disciplinary infraction is expressly retained by, or otherwise given to, CoreCivic.  (Exhibit B, Article 16, Section 4.)

Article 17 of the Agreement sets out a grievance and arbitration process as "the exclusive method to be followed by the Union and the bargaining unit employees in the adjustment or settlement of any dispute, controversy, or disagreement regarding the interpretation or application of the express written terms and provisions set forth in [the] Agreement." (Exhibit B, Article 17, Section 1; *see also*, Exhibit B, Article 16, Section 1 ("[T]he grievance and arbitration provisions of this Agreement shall be the sole method of resolving any contractual dispute regarding any discipline.").)

Article 17 of the Agreement provides an arbitration process for disputes that remain unresolved through the earlier threshold grievance steps.  The arbitration process both

4

empowers and expressly limits the scope of an arbitrator selected to hear and resolve a matter.  Article 17, Section 5 provides, in relevant part,

    a.    The arbitrator shall only have authority to decide if CoreCivic violated the express terms of the Agreement (Exhibit B, Article 17, Section 5b);

    b.    The arbitrator shall have no authority to add to, subtract from, supplement, or modify the Agreement in any way (Exhibit B, Article 17, Section 5b);

    c.    The arbitrator shall have no power to substitute their discretion in cases where CoreCivic has retained discretion or has been given discretion by the Agreement (Exhibit B, Article 17, Section 5b);

    d.    The arbitrator's decision must be based solely on the evidence presented to the arbitrator by the respective parties or their counsel in the presence of each other and the arguments presented in the parties' post-hearing written briefs (Exhibit B, Article 17, Section 5g); and

    e.    In matters of discipline like that in the underlying arbitration subject of this petition and motion to vacate, the arbitrator shall determine the circumstances upon which the discipline was based and, if the circumstances were substantially as found by the Employer, "the discipline will not be disturbed absent an express finding of unreasonableness."  (Exhibit B, Article 17, Section 5e.)

The Grievant was hired as a correctional officer at CAFCC in August 2014. (Exhibit A, p. 5.)

CoreCivic issued a "Problem Solving Notice" (PSN) to the Grievant on April 16, 2019. The corrective action taken was "termination."  The Grievant was discharged for his repeated failure to perform required suicide precaution close observations of an at-risk detainee housed in the facility's RHU and falsifying four written entries on the detainee's official activity record in an attempt to conceal that failure to perform. (Exhibit A, pp. 5–6.)

The Union filed a grievance contesting the Grievant's termination.  (Exhibit C; 4/25/2019 SPFPA Grievance of Guadalupe Luna, Grievance number 21) The Union's grievance did not contest the circumstances upon which the discipline was based, i.e., that the Grievant failed to perform required close observation safety checks and falsified records indicating that the checks had been performed. Rather, the Union challenged the penalty alone, claiming the Grievant's termination was inconsistent with discipline issued to other correctional officers who committed a similar offense.  The grievance sought to have the termination reduced to a one-day suspension. (*See* Exhibit A, p. 8.)

The grievance was processed under the terms of the Agreement and met all procedural requirements.  As of the arbitration hearing, the Parties agreed the dispute was properly before the Arbitrator to issue an Opinion and Award. (Exhibit A, p. 3.)

Under the terms of the Agreement, the Parties selected Arbitrator Renée Mayne to preside over the arbitration proceedings. (Exhibit A, p. 3.)

The arbitration hearing convened on September 22, 2020, at 9:00 a.m. (Exhibit A, p. 3.) A copy of the hearing transcript is attached hereto as Exhibit D.

The arbitration record was officially closed after counsel for the Parties filed their post-hearing briefs with Arbitrator Mayne on November 12, 2020.  (Exhibit A, p. 3.) The Union's post-hearing brief is attached hereto as Exhibit C.  CoreCivic's post-hearing brief is attached hereto as Exhibit F.

Arbitrator Mayne issued her Opinion and Award on December 11, 2020. (Exhibit A, p. 17.)  The Opinion and Award were served on the parties by Electronic Mail that same day, December 11, 2020.  (Exhibit A, Proof of Service.)

Arbitrator Mayne determined the circumstances upon which CoreCivic disciplined the Grievant were substantially as found by CoreCivic, to wit:

a.   On January 31, 2019, the Grievant was assigned to the RHU, a restricted unit in the CAFCC detention facility housing at-risk, suicidal detainees who may be a danger to themselves or others (Exhibit A, p. 6);

b.    The protocol for at-risk detainees housed in the RHU involves a physician who examines the detainee and issues suicide precautionary orders for their care and close observation supervision. The physician's orders are then included on an official form posted outside the at-risk detainee's cell, referred to as the Monitoring Form 13-63A, in line with CoreCivic's safety policy and procedure Observation Beds Policy No. 13-63 (Exhibit A, p. 6);

c.    A correctional officer assigned to the custody and care of an at-risk detainee in the RHU is required to comply with the physician's suicide precaution orders and to timely and accurately document their compliance on the Monitoring Form 13-63A. The officer may walk the unit as long as the officer performs the close observation safety checks on the at-risk detainee's activities within the required time frame ordered by the physician (Exhibit A, pp. 6–7);

d.    The facility had a quality assurance program for the care that corrections officers provided to detainees. In March 2019, a nurse working at the CAFCC facility, in the course of performing her quarterly quality assurance monitoring, compared the facility's digital security footage for January 31, 2019, with the Grievant's entries on the Monitoring Form 13-63A for that day. The nurse found some of the time stamps on the video for January 31, 2019, did not match the Grievant's entries on the monitoring form. And, the digital security footage showed the Grievant's failure to perform the required close observation suicide precaution checks. The nurse reported the inconsistencies to the CAFCC Assistant Chief of Security. In turn, the Assistant Chief of Security investigated the possible misconduct. On March 29, 2019, the Assistant Chief met with the Grievant as a part of that investigation (Exhibit A, pp. 6, 15);

e.    In the March 29, 2019 meeting with the Assistant Chief of Security, the Grievant provided a written incident statement in which the Grievant admitted

he did not complete the required close observation suicide precaution checks on the at-risk RHU detainee and that he falsified four written entries on the detainee's official activity record in an attempt to conceal his failure to perform  (Exhibit A, p. 15 "the Grievant admitted in writing that he did not complete the checks on the detainee, and he falsified times on the monitoring form"); and,

f.      As a result of the investigation, it was determined the Grievant failed to conduct multiple required close observation suicide precaution safety checks on the at-risk detainee housed in the RHU and that, in an effort to conceal that failure to perform, the Grievant falsified four entries on the official detainee monitoring form indicating that Grievant had performed the required checks. (Exhibit A, p. 6.)

Prior to approving the PSN and making the decision to terminate the Grievant, the Warden considered: (1) the Grievant's March 29, 2019 written statement and admission made therein to his failure to perform the required suicide precaution welfare checks on the at-risk RHU detainee and falsification of detainee monitoring records; (2) the digital security footage confirming the Grievant's admitted misconduct and the evidence related to the misconduct; (3) Grievant's previous disciplinary history; (4) consistency of discipline issued for similar misconduct; and (5) the significance of the misconduct. (Exhibit A, p. 13; Exhibit D, Transcript of Arbitration Proceedings, pp. 108:18-25; 109:4-15; 11:14-25; 112:1-2.)

As noted above, the underlying Union grievance filed in this matter did not contest the factual circumstances as found by CoreCivic leading to termination. (Exhibit C.) Likewise, at arbitration, the Union again did not challenge the facts upon which the discipline was based as admitted by the Grievant and as found by the Employer (i.e., the Grievant failed to conduct four required suicide precaution close observation safety checks on the RHU at-risk detainee and, in an effort to conceal that failure to perform, Grievant

1   falsified four entries on the official detainee monitoring form indicating that Grievant had
2   performed the required checks).

3       At arbitration, the Union challenged the penalty of termination again arguing that
4   CoreCivic deviated from past practice of suspending, rather than terminating, similarly
5   situated employees. (Exhibit C; Exhibit E, pp. 5–7.)

6       At arbitration, the Union also advanced two additional, new arguments challenging
7   the Employer-imposed penalty that had not been raised in the grievance itself: First, the
8   Grievant was discriminated against because of his Union affiliation (Exhibit A, p. 13); and,
9   second,  an alleged mitigating medical condition that prevented the Grievant from timely
10  performing the required observations of the at-risk RHU detainee's activity every 15
11  minutes as required by CoreCivic policy and the suicide precaution close observation
12  orders. (Exhibit A, p. 8.)

13      With respect to the Union's challenge seeking to have the Grievant reinstated with a
14  one-day suspension based upon the consistency with another officer's discipline, the
15  Arbitrator rejected the Union's claim. Rather, the Arbitrator credited the Warden's
16  testimony that the Grievant's discipline was in line with discipline issued to similarly
17  situated employees. (Exhibit A, pp. 7–8; "[I]nfractions fell into two categories. The first
18  category included those officers who pre-dated or post-dated an entry on the form but
19  actually did check the detainee; these officers were disciplined but not terminated.  In the
20  second category, officers who claimed they monitored the inmate but did not actually
21  perform the required checks were terminated.")

22      As to the Union's argument first made at the arbitration hearing of disparate
23  treatment based upon union activity, the Arbitrator rejected the Union's argument finding
24  there was insufficient evidence that the Grievant was discharged because of his union
25  affiliation. (Exhibit A, p. 15.)

26      As to the Union's other new claim first asserted at the arbitration hearing - i.e., that
27  a medical condition justified Grievant's failure to perform the required at-risk RHU
28  detainee suicide precaution close observation checks, the Grievant testified:

a.  He had amblyopia, an eye condition (Exhibit A, p. 9);

b.  On December 19, 2018, the Grievant's amblyopia was surgically treated (Exhibit A, p. 9);

c.  He took medical leave for the surgery and recovery period through January 19, 2019 (Exhibit A, pp. 9–10);

d.  Grievant returned to work on January 20, 2019 (Exhibit A, p. 10); and,

e.  Eleven days after his return to work from his medical leave (and 43 days after his surgery), on January 31, 2019, the date of the incidents that led to his discharge, the Grievant experienced vertigo. (Exhibit A, p. 15); and

f.  As a result of the vertigo episode, Grievant had to walk very slowly so as not to fall, which affected the timeliness of his close observation checks on the RHU at-risk detainee. (Exhibit A, p. 15.)

During the disciplinary investigation leading up to the termination, the Grievant did not advise CoreCivic of the alleged vertigo, the need for light duty, or much less offer the condition as justification for the Grievant's failure to perform the required close observation safety checks. (Exhibit A, p. 10.)  As a result, the Grievant's alleged vertigo was not considered by the Employer as part of the underlying circumstances upon which the discipline was based.

After the termination, during the grievance process itself, neither the Union nor the Grievant raised the alleged vertigo condition as a challenge to the disciplinary action or the Employer-issued penalty. (*See* Exhibit A, pp. 10–13.)

Arbitrator Mayne found that even though the Grievant admitted he failed to complete multiple close observation safety suicide precaution checks on a high-risk detainee, and repeatedly falsified the detainee monitoring form which violated CoreCivic policies and the collective bargaining agreement, it was insufficient proof of just cause for the Grievant's discharge.  Having so concluded, the Arbitrator changed the Employer-imposed discipline to a one-day suspension.  The Arbitrator pointed to three factors in an attempt to justify the substitution of her own discretion as to the appropriate penalty for that discretion expressly

reserved by, or otherwise given to, CoreCivic under the Agreement to determine the appropriate penalty:

     a.    Grievant worked for CoreCivic for almost five years with no prior discipline, i.e., this was his first offense, "albeit a serious one" (Exhibit A, p. 16);

     b.    There was a mitigating circumstance in that "it [was] not implausible" that the Grievant could have experienced complications six weeks after eye surgery that could have made him walk slowly  (Exhibit A, p. 16); and

     c.    The digital security footage was not introduced into evidence as further corroborating evidence of the Grievant's admitted misconduct, and thus, was a "compelling" justification for disturbing the Employer-imposed termination disciplinary penalty and converting it to a one-day suspension.

What Arbitrator Mayne failed to do, however, was to comply with the Agreement's unambiguous narrowly defined and limited basis on which any deviation from the Employer-imposed disciplinary penalty must be based. Arbitrator Mayne failed to make an "expressed finding of unreasonableness" as to the Employer-issued discipline in light of the circumstances as found by the Employer and upon which the discipline was based. (*See* Exhibit B, Article 17, Section 5e.)

# I.    LEGAL ANALYSIS

## A.    Standard of Review

Federal courts apply a uniform body of federal substantive law in interpreting collective bargaining agreements in Section 301 cases. *See Smith v. Evening News Ass'n*, 371 U.S. 195 (1962).

Though judicial scrutiny of an arbitrator's decision in a labor dispute is limited, the Ninth Circuit has identified four instances in which an award under Section 301 should be vacated:

     a.    when the award does not draw its essence from the collective bargaining agreement;

     b.    when the arbitrator exceeds the scope of the issues submitted;

c.      when the award runs counter to public policy; and

d.      when the award is procured by fraud.

*Sprewell v. Golden State Warriors*, 266 F.3d 979, 986 (9th Cir. 2001) *opinion amended on other grounds*, 275 F.3d 1187 (9th Cir. 2001) (noting circumstances where a court may properly vacate an arbitration award under Section 301) (*citing SFIC Props., Inc. v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. Lodge 94*, 103 F.3d 923, 925 (9th Cir. 1996) (internal quotations omitted); *Chiron Corp. v. Ortho Diagnostic Sys., Inc*., 207 F.3d 1126, 134 (9th Cir. 2000)).

An award should be vacated when any one of the above considerations is present in an award or its issuance. *Id*.

Here, Arbitrator Mayne ignored the plain and unambiguous language of the Agreement, exceeded the scope of her authority, and violated public policy by ordering reinstatement of the Grievant. *See United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960) (when issuing awards, "an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice."); *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc*., 484 U.S. 29, 38 (1987) ("[an] arbitrator may not ignore the plain language of the contract").

Indeed, when, as here, Arbitrator Mayne's words "manifest an infidelity to [her] obligation" to interpret and apply the Agreement, "courts have no choice but to [vacate] the award." *Id.*  Indeed, in addition to the Ninth Circuit's standard, 9 U.S.C. § 10 provides that an award should be vacated "where the arbitrators exceeded their powers" under the Agreement.

**B.      The Opinion And Award Does Not Draw Its Essence From The Agreement**

To be sustained, the Opinion and Award must draw its essence from the Parties' Agreement.

The Parties' Agreement expressly and unambiguously provides:

a.  CoreCivic has the right to discipline, suspend, or discharge for just cause (Exhibit B, Article 16, Section 1);

b.  Discipline, up to and including termination, for violations of the work rules set out in Appendix A to the Agreement meets the required just cause standard (Exhibit B, Article 16, Section 1);

c.  Among the violations set out in Appendix A and considered by the Parties to constitute just cause for discipline, up to and including termination are:

    1)  Engaging in any conduct in violation of CoreCivic's Code of Ethics and Business Conduct (Exhibit B, Article 16, Appendix A, 2);

    2)  Engaging in any conduct in violation of CoreCivic's safety policies, procedures, or regulations (Exhibit B, Article 16, Appendix A, 6);

    3)  Providing false, misleading, or incomplete information on CoreCivic forms, records, reports, or documents (Exhibit B, Article 16, Appendix A, 8);

    4)  Incomplete, negligence, or careless inattention in the performance of duties or the failure to properly and completely perform assigned duties, any other act or omission that leads to or could have resulted in danger to any detainee (Exhibit B, Article 16, Appendix A, 13) and

    5)  Any act or omission that leads or could have resulted in danger or harm to any detainee. (Exhibit B, Appendix A 13.)

d.  The Employer has retained, or otherwise been given, the sole discretion to determine the appropriate penalty for any disciplinary infraction (Exhibit B, Article 16, Section 4);

e.  If disciplinary action is challenged to the point of arbitration, the arbitrator:

1)  Has no power to substitute her discretion in cases where the Employer has retained discretion or been given discretion by this Agreement (e.g., determining the appropriate penalty for any disciplinary infraction) (Exhibit B, Article 17, Section 5b);

2)  Shall determine the circumstances upon which the discipline was based (Exhibit B, Article 17, Section 5e); and

3)  If the circumstances upon which the discipline was based were "substantially as found by the Employer", the discipline "will not be disturbed" absent an "express finding" by the arbitrator that under those circumstances the disciplinary penalty was unreasonable. (Exhibit B, Article 17, Section 5e.)

The underlying Union grievance did not challenge the circumstances on which CoreCivic based its decision to discipline the Grievant. (Exhibit C.)  Rather, the Union grievance contested the disciplinary penalty of termination that was based on those circumstances.

Arbitrator Mayne found the circumstances on which CoreCivic based its decision to discipline the Grievant were substantially as CoreCivic found them to be at the time of the discipline (i.e., that the Grievant did, in fact, fail to conduct four required close observation suicide precaution safety checks on a "high-risk" RHU detainee and, in an attempt to conceal that failure to perform, knowingly falsified entries on the detainee's monitoring form indicating that Grievant had performed the required checks when he had not). (Exhibit A, p. 16, Grievant's admitted conduct violated "the [Employer's] policies and the collective bargaining agreement".)

Given the Arbitrator's finding that the factual circumstances upon which the discipline was based were substantially as found by CoreCivic at the time of termination (and, indeed, given further that these factual circumstance were not challenged by either the

14

Grievant or Union), under the clear and express limitations imposed by the Agreement on the Arbitrator's authority, in order to disturb the Employer-imposed penalty of termination, Arbitrator Mayne was required to  make "an express finding" that the discipline was "unreasonable." Absent the express finding of unreasonableness, Arbitrator Mayne had no authority to substitute her discretion for that of the Employer and disturb the issued discipline. (Exhibit B, Article 17, Section 5e; *see also* Article 17 Section 5b given the express retention by or grant of discretion to CoreCivic to determine the appropriate disciplinary penalty, the Arbitrator had no authority to substitute her discretion.)

Arbitrator Mayne's Opinion and Award makes no express finding of unreasonableness regarding the discipline issued to the Grievant.

The Union argued the termination was not consistent with CoreCivic's discipline of similarly situated employees. Arbitrator Mayne rejected the Union's argument crediting instead the Warden's testimony that employees who engaged in similar infractions (i.e., failing to do the required close observation suicide precaution checks and falsifying records in an attempt to conceal the failure to perform) were terminated. (Exhibit A, pp. 7–8.)

The Union argued the termination was because of Grievant's Union affiliation. Arbitrator Mayne rejected the Union's argument finding there was insufficient evidence that the Grievant was discharged because of his Union affiliation. (Exhibit A, p. 15.)

However, Arbitrator Mayne did conclude the Grievant's admitted misconduct was insufficient to prove just cause for discharge. (Exhibit A, p. 16.) (Though the Grievant confessed to failing to complete four mandated close observation suicide precaution checks on the high-risk RHU detainee and to falsifying the official detainee monitoring form, which violated CoreCivic policies and the collective bargaining agreement, his admission is insufficient to prove just cause for his discharge.)

Arbitrator Mayne relied upon three considerations for support in disturbing the disciplinary penalty imposed by CoreCivic:

a.   "First, [the Grievant] was an employee with no former discipline. He had worked for [CoreCivic] for almost five years and this was his first offense, albeit a serious one." (Exhibit A, p. 16);

b.   Second, "there was a mitigating circumstance." "The Grievant had returned from medical leave eleven days before the incident, and it is not implausible that he had complications and had to walk slowly." (Exhibit A, p. 16); and

c.   Third, the Employer's failure to introduce into evidence the corroborating digital security footage was "compelling" justification for the modification of the Employer-issued disciplinary penalty. Without the footage corroborating evidence, "[the Employer's] case to prove just cause was significantly impaired." (Exhibit A, p. 16.)

There is no interpretive route that draws its essence from the Agreement and yet still supports the three considerations offered by Arbitrator Mayne as justification for disturbing the Employer-imposed penalty.

In relying upon the Grievant's disciplinary record as justification to disturb the Employer-imposed disciplinary penalty, the Arbitrator ignored the clear and express language of the Agreement, to wit:

a.   The Agreement expressly provides that Arbitrator Mayne "shall have no power to substitute [her] discretion in cases where the Employer has retained or has been granted discretion by this Agreement." (Exhibit B, Article 17, Section 5b);

b.   The Agreement expressly provides that "the appropriate [discipline] penalty shall be at the discretion of the Employer." (Exhibit B, Article 16, Section 4); and

c.   The Employer exercised the retained or granted discretion in line with the guidelines set out in the Agreement in determining the disciplinary penalty including considering the prior disciplinary record of the

employee. (Exhibit A, Article 16, Section 4, *see also* Exhibit D, pp. 111:14-25, 112:1-2) That the Arbitrator, in her discretion, gave the lack of a disciplinary record different weight in determining the appropriate penalty than the Employer did in exercising its retained or given discretion in setting the penalty is outside of, and in direct contravention with, the scope of her authority as defined in the Agreement. (*See* Exhibit B, Article 17, Section 5b.) The arbitrator shall have no power to substitute their discretion in cases where CoreCivic has retained discretion or has been given discretion by the Agreement.)

Arbitrator Mayne concluded that it was "not improbable" the Grievant could have had vertigo from an eye procedure some six weeks prior to the event that gave rise to his termination and that this mitigating possibility could have caused him to walk slow and miss doing the required checks in a timely manner.  Her reliance is wholly misplaced and is in direct contravention with the express limitations on the Arbitrator's authority under the Agreement.

    a.    The Grievant was not late in performing the required close observation suicide precautionary checks. Rather, he failed to do them altogether – a determination the Arbitrator sustained and to which the Grievant admitted.  (*See* Exhibit A, p. 15.) (The Grievant failed to complete four mandated suicide precaution close observation checks on a high-risk detainee.) Therefore, the possibility of a condition which could have resulted in the Grievant not performing the checks in the required time frame because of walking slow does not provide the "mitigation" relied upon by the Arbitrator for the complete failure to do the mandated checks.

    b.    Further, even if one assumes, for the sake of argument, that, as the Arbitrator noted "it is not implausible" the Grievant could have had the alleged vertigo impacting the speed at which he performed the

required checks, there is no accounting in this "mitigation" for the undisputed fact that Grievant intentionally falsified official detainee records in an attempt to conceal the failure to perform, which in and of itself is just cause offense for termination under the Agreement. (*See* Exhibit B, Article 16, Appendix 8.)

    c.    Even if true, vertigo was first raised as an excuse in the arbitration hearing – not during the investigation of the misconduct, not in the Grievant's written admission of the misconduct, and not in the underlying grievance itself.  To the extent there was a vertigo condition, it was never disclosed to the Warden, Assistant Chief of Security, or Human Resources during the investigation of the misconduct or otherwise known by the Warden at the time he rendered the termination decision. (Exhibit A, pp. 10–13.)  As the plausible vertigo condition falls outside of the underlying circumstances considered and as determined by the Employer at the time of discipline, it cannot be a basis for deciding if the penalty issued based upon those known circumstances is unreasonable. The standard set out in the Agreement requires the Arbitrator to make an express finding that the penalty was unreasonable when considering the circumstances then known to the Employer and that served as the basis for the penalty.

Arbitrator Mayne relied upon CoreCivic's failure to introduce into evidence the corroborating digital security footage as a "compelling" justification for the modification of the disciplinary penalty.  Again, her reliance is misplaced and is in direct contravention with the Agreement's express limitations regarding the Arbitrator's authority.

    a.    Arbitrator Mayne's sole duty was to determine if circumstances upon which the Employer-imposed discipline was based were "substantially as found by the Employer."  (Exhibit B, Article 17, Section 5e.)

b.    The circumstances upon which the discipline was based, as found by the Employer, was that the Grievant failed to conduct four required close observation suicide precaution safety checks on a high-risk RHU detainee and, in an attempt to conceal that failure to perform, knowingly falsified entries on the detainee's official monitoring form indicating that the Grievant had performed the required checks.

c.    The Union did not dispute the circumstances as found by CoreCivic.

d.    The Grievant admitted to the circumstances as found by CoreCivic.

e.    Arbitrator Mayne found the circumstances to be as determined by the Employer in that the Grievant failed to conduct four required close observation suicide precaution safety checks on a high-risk RHU detainee and, in an attempt to conceal that failure to perform, knowingly falsified entries on the detainee's monitoring form indicating that Grievant had performed the required checks.  (*See* Exhibit A, p. 16.)

f.     Arbitrator Mayne expressly credited the Warden's review and analysis that the digital security footage was part of the process used by the Employer to verify the Grievant's misconduct on which the disciplinary penalty was based. (Exhibit A, pp. 15-16.)

g.    In sum, there is no challenge to the underlying factual circumstances, as determined by the Employer, upon which the discipline was issued. The introduction of the digital security footage as evidence in the arbitration hearing would have been merely further corroboration, and not determinative, of the underlying factual circumstances upon which the discipline was based as found by the Employer.  The reverse is true as well. The absence of the security video tape in evidence did not cast any doubt as to the otherwise unchallenged factual circumstances upon which the discipline was based.

    h.    The failure to introduce the digital security footage in the arbitration hearing as further corroboration of the unchallenged underlying circumstances falls fatally short of the required express finding that the Employer-issued penalty is unreasonable necessary to disturb that penalty.

Independently, Arbitrator Mayne's reliance upon CoreCivic's failure to introduce into evidence the corroborating digital security footage as a "compelling" justification for the modification of the disciplinary penalty exceeds the scope of her jurisdiction and the adjudicatory power granted under the express terms of the Agreement.

    a.    Arbitrator Mayne's decision and award must be based solely on the arguments presented in the written briefs of the parties. (Exhibit B; Article 17, Section 5g.)

    b.    The hearing record on this matter as well as the Union's written post-hearing brief are devoid of the argument now put forth by Arbitrator Mayne as "compelling justification" for modification of the Employer-imposed disciplinary penalty.

    c.    The Union's arguments for modification of the Employer-imposed disciplinary penalty were:

    1)    In the grievance itself, Grievant's termination was inconsistent with discipline issued to other correctional officers who committed a similar offense (Exhibit E);

    2)    At the hearing on the matter, (a) the penalty assessed was incommensurate with the serious of the offense given the Employer had issued penalties short of termination for the same or similar offenses (Exhibit D, p. 13:16-21) and (b) the Employer failed to properly consider the Grievant's work history, consistency of discipline, impact on the Employer's contractual obligations, and the actual consequences of the

offense before assessing the discipline imposed. (Exhibit D, pp. 14:16-25; 15:1-2); and

      3)    In the Union's post-hearing brief, (a) disparate treatment in terms of the discipline imposed when compared to penalties for the same or similar offenses, (b) disparate treatment based upon Grievant's union membership as compared to penalties issued to non-union members in the bargaining unit, (c) the Employer failed to properly consider the Grievant's work history, consistency of discipline, impact on the Employer's contractual obligations, and the actual consequences of the offense before assessing the discipline imposed, and (d) the Employer's failure to accommodate Grievant's vertigo. (Exhibit E.)

    d.    The argument relied upon by Arbitrator Mayne that failure to introduce into evidence the corroborating security video tape as a "compelling" justification for the modification of the disciplinary penalty is one of her own making and, as such, falls well outside the Agreement's clear and express parameters as to her power and scope of jurisdiction.

Moreover, it improper for Arbitrator Mayne to rely upon CoreCivic's failure to introduce into evidence the corroborating digital security footage as a "compelling" justification for the modification of the disciplinary penalty.  Again:

    a.    The circumstances upon which the discipline was based, as found by the Employer, was that the Grievant failed to conduct four required close observation suicide precaution safety checks on a high-risk RHU detainee and, in an attempt to conceal that failure to perform, knowingly falsified entries on the detainee's official monitoring form indicating that the Grievant had performed the required checks.

    b.    The Union did not dispute the circumstances as found by CoreCivic.

    c.    The Grievant admitted to the circumstances as found by CoreCivic.

d.    Arbitrator Mayne found the circumstances to be as determined by the Employer in that the Grievant failed to conduct four required close observation suicide precaution safety checks on a high-risk RHU detainee and, in an attempt to conceal that failure to perform, knowingly falsified entries on the detainee's monitoring form indicating that Grievant had performed the required checks.  (*See* Exhibit A, p. 16.)

e.    Indeed, Arbitrator Mayne expressly credited the Warden's review and analysis that the digital security footage was part of the process used by the Employer to verify the Grievant's misconduct on which the disciplinary penalty was based. (Exhibit A, pp. 15-16);

f.    As such, it was improper for Arbitrator Mayne to rely on the failure to introduce the digital security footage as evidence in the arbitration hearing (which would only further corroborate uncontested facts upon which CoreCivic based its disciplinary action) as a "compelling" justification for the modification of the disciplinary penalty.

By finding that the factual circumstances upon which the discipline was based were substantially as found by CoreCivic at the time of termination yet, nonetheless, disturbing the disciplinary penalty issued by CoreCivic without the required expressed finding of unreasonableness, but rather as the result of substituting her discretion for that of the Employer as to the appropriate penalty, and, independently, by considering matters outside of the arguments presented by the parties, Arbitrator Mayne exceeded her authority under the terms of the Agreement and acted irrationally and in direct contravention of the clear and unambiguous expressed language of the Agreement. *United Steelworkers*, 363 U.S. at 597 ("an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice."); *Lagstein v. Certain Underwriters at Lloyd's, London*, 607 F.3d 634, 641–642 (9th Cir. 2010) ("completely irrational" award exceeds the arbitrator's powers under 9 U.S.C. § 10(a)(4)).

Accordingly, Arbitrator Mayne exceeded her authority and her Opinion and Award failed to draw its essence from the Agreement and must be vacated.

**C.    Independently, Arbitrator Mayne's Opinion and Award Violates Public Policy**

As a service provider to the United States Department of Homeland Security, U.S. Immigration and Customs Enforcement ("ICE"), CoreCivic's operations are guided by, and must be in conformance with, federal government policies, procedures, and national performance-based detention standards. (*See* U.S. Immigration and Customs Enforcement Performance-Based National Detention Standards 2011 ("PBNDS 2011") available at https://www.ice.gov/detain/detention-management/2011.)

PBNDS 2011 is drafted to include a range of compliance obligations and expectations founded upon well-established public policy standards –i.e., "protecting the community, staff, contractors, volunteers and detainees from harm by ensuring that facility security is maintained and events which pose risk of harm are prevented." (PBNDS 2011, Section 2.4 Facility Security and Control.)

Among the expected PBNDS outcomes are that the facility housing ICE detainees, like CoreCivic's CAFCC, will "develop and document comprehensive detainee supervision guidelines…" ( PBNDS 2011, Section 2.4 Facility Security and Control, #1) and that "information about routine procedures, emergency situations and unusual incidents will be continually recorded in permanent post logs and shift reports…" (PBNDS 2011, Section 2.4 Facility Security and Control, #5.)

Consistent with, and as a means by which to achieve the expected outcomes, the PBNDS sets out expected practices regarding facility security and control.  These expectations include that each facility "shall ensure that it maintains sufficient supervision of detainees… to prevent significant self-harm and suicide… and minimize events that pose a risk of harm to persons and property."  (PBNDS 2011, Section 2.4 Facility Security and Control, A.)

The facility is expected to have, and the correctional staff are expected to follow, post orders requiring housing officers to maintain a housing unit log for "recording information regarding routine unit operations as well as unusual and emergency incidents." (PBNDS 2011, Section 2.4 Facility Security and Control, #5.)

When it comes to Special Management Units ("SMU"), like the RHU at CAFCC to which the Grievant was assigned when he failed to perform the mandated close observation suicide precaution safety checks on the detainee and falsified official records to cover up his failure, the PBNDS 2011 has specific directives as well as expected outcomes and practices. (PBNDS 2011, Section 2.12 Special Management Unit.)

In particular, with regard to SMU, the U.S. Homeland Security/ICE directives and standards are anchored to an overall public policy: "protect[ing] detainees, staff, contractors, volunteers and the community from harm by segregating certain detainees from the general population in special management units." (PBNDS 2011, Section 2.12, I.)

In furtherance of the above-stated public policy, the PBNDS sets out expectations of the facility and its correctional staff that include requiring permanent SMU logs and individual detainee records detailing the circumstances related to a detainee's confinement to the SMU as well as all activities of the detainee while in SMU. (PBNDS 2011, Section 2.12, II, #20; Section 2.12 D Logs and Records (1).)

The PBNDS directs that detainees in SMU are to be "personally observed and logged" at least every 30 minutes on an irregular schedule, or more frequently when cases warrant increased observation, as was the directive under which the Grievant was working, under "close" and "personal" supervision of the correctional officer assigned to the SHU.

The SMU assigned correctional officer, which in the underlying case was the Grievant, is charged under the PBNDS directives with immediately recording "information such as whether the detainee has a medical condition or has exhibited suicidal/assaultive behavior." (PBNDS 2011, Section 2.12, II, #20; Section 2.12 D Logs and Records (3)(a); M Close Supervision.)

The correctional officer position at CAFCC held by the Grievant in this matter is a "Public Trust" position requiring a security clearance issued by the United States Government; a security clearance that requires the individual seeking to obtain or maintain that clearance to be determined suitable for work in a public trust position. (*See* DHS Directives Instruction Handbook 121-01-007, The Department of Homeland Security Personnel Suitability and Security Program, June 2009 "All covered individuals with unescorted access to DHS facilities undergo a suitability/fitness investigation and determination.")

A Public Trust position is a job considered at a high or moderate risk potential for adverse impact to the efficiency or integrity of the service.  (5 CFR 731.106 (a) & (b).)

Public Trust positions require persons not only with the right job skills, but also require a much higher degree of integrity and trustworthiness with unwavering public confidence in the individual occupying the position. *(See generally*, U.S. Department of Defense Civilian Personnel Advisory Service, Procedures and Guidance for Civilian Employment Suitability and Fitness Determinations within the Department of Defense Last Updated: 28-July-2016 Version 1.0.)

Grievant violated the public trust bestowed on him by the United States federal government as a correctional officer at CAFCC.

In dereliction of his duties as a correctional officer, he repeatedly failed to perform mandated close observation suicide precautionary safety checks of the high-risk detainee under his watch.

Further, to conceal his failure to perform, he signed false certifications attesting to having conducted multiple close observations on the high-risk detainee when, in truth, the required observations were never conducted.

Given the well-established fundamental public policy embedded in the underlying mission of DHS/ICE as well as the public trust, a correctional officer is considered unfit for duty and must be removed from, and disqualified for, public trust work when the officer

1   has neglected his duty, falsified any official document or record, or concealed a material

2   fact by willful omission from official documents or records.

3         Arbitrator Mayne, faced with admitted, uncontested facts that Grievant: (1) willfully,

4   knowingly, and repeatedly neglected his duty to perform mandated close supervision and

5   suicide precautionary observation of the RHU detainee under his charge; and (2) to conceal

6   his failure to perform, willfully, knowingly, and repeatedly signed false certifications

7   attesting to having conducted multiple observations when, in truth, the required

8   observations were never conducted, in direct contravention to well established public

9   policy, ordered reinstatement of the Grievant as a correctional officer, reducing the penalty

10  to a one-day suspension; federal policy, regulation, and law – as well as specific service

11  contract agreements with agencies of the United States government – would direct that

12  Grievant not be so reinstated and the Court should, therefore vacate the Opinion and Award.

13  *Sprewell,* 266 F.3d at 986.

14  **III.    CONCLUSION**

15        As the Opinion and Award of Arbitrator Renée Mayne, issued December 11, 2020,

16  FMCS Case No. 190723-09302, fails to draw its essence from the Agreement, exceeds the

17  Arbitrator's authority and otherwise violates public policy, CoreCivic respectfully requests

18  that this Motion be granted and the award be vacated in its entirety.  CoreCivic also requests

19  reasonable costs incurred in bringing this Petition and Motion to Vacate.

20        DATED this 10th day of March, 2021.

21                STRUCK LOVE BOJANOWSKI & ACEDO, PLC

22

23             By   /s/ Daniel P. Struck

24               Daniel P. Struck

             Jamie D. Guzman

25               3100 West Ray Road, Suite 300

             Chandler, Arizona 85226

26               *Attorneys for Petitioner*

27

28