**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| CoreCivic of Tennessee, | No. CV-21-00410-PHX-MTL |
| Petitioner, | **ORDER** |
| v. | |
| Local 825 International Union, Security, Police and Fire Professionals of America, et al., | |
| Respondents. | |

After CoreCivic of Tennessee ("CoreCivic") terminated Guadalupe Luna-Ramirez the Local 825 International Union, Security, Police and Fire Professionals of America ("Union") contested the termination by filing a grievance under the collective bargaining agreement ("CBA"). (Doc. 1-2 at 5.) The grievance was moved to arbitration under Article 17 of the CBA. (*Id.* at 5, 30.) After an arbitration award was issued, CoreCivic filed a Petition and Motion to Vacate Arbitrator's Award Under § 301 of the Labor Management Relations Act ("Petition") (Doc. 1) alleging grounds to vacate the arbitrator's award. The Union has moved to dismiss. (Doc. 9, the "Motion".) The Parties fully briefed the Motion and the Court held oral argument. The Court resolves the Motion as follows.

**I.     FACTUAL BACKGROUND**

    **A.     Ramirez's Relevant Work History**

Ramirez was hired by CoreCivic around October 2014 as a corrections officer at the Central Arizona Florence Correctional Center ("CAFCC") in Florence, Arizona.

(Doc. 1 at 2; Doc. 1-2 at 86.) He was a member of the Union. (*See* Doc. 9 at 4.) Before the incident leading to his termination, he had never been disciplined while working at CAFCC. (Doc. 1-2 at 166.) In December 2018, Ramirez underwent eye surgery. (*Id.* at 271.) A side effect of this surgery was vertigo. (*Id.*) Ramirez took time off of work in order to recover. (*Id.* at 281–83.) He was cleared to return to work on or around January 20, 2019. (*Id.* at 283–84.)

The incident that gave rise to this action occurred less than two weeks later. (*Id.* at 325, 358.) Ramirez was working in the Restricted Housing Unit ("RHU") where he and one other officer would observe around 52 detainees. (*Id.*) Because they pose a danger to themselves, "[t]he facility's protocol for such detainees involved a physician who examined the detainee and issued orders for their care and supervision. Those orders were included on a form posted outside the detainee's cell, referred to as the Monitoring Form 13-63A." (*Id.* at 8.) Part of Ramirez's assignment to the RHU involved completing 13-63A verification forms, one for each detainee under observation, every 15 minutes. (*Id.* at 108–09.) Observing these detainees meant that Ramirez was required to make regular rounds—walking to where each detainee was held and identifying their behavior at the time of observation. (*See* Doc. 1-2 at 111; Doc. 9 at 5.)

During the first hour of his shift, Ramirez's vertigo began to spike. (Doc. 1-2 at 286–87; *see id.* at 286–288.) As it became progressively more severe, he was at risk of falling. (*Id.* at 286–88.) This forced him to walk slowly while on his shift. (*Id.*) This made completing his rounds in the required 15-minute increments difficult. (*Id.*) And so, he asked his supervisor for an accommodation. (*Id.*) Instead of working a station that involved walking, he asked to be reassigned to a position where he could sit, but his request was denied. (*Id.*) Because Ramirez had to slow down while making his rounds, he was unable to complete them within 15 minutes, and falsified several entries on the 13-63A forms as a result. (*Id.* at 271–72, 280–81, 286–88.) No detainees were harmed. (*Id.* at 166.)

**B.    CoreCivic's Internal Investigation**

The completed 13-63A forms are reviewed by medical quality assurance nurses.

(*Id.* at 123, 128, 157.) These quality assurance reviews are done at random on a quarterly basis meaning that any forms can be pulled at any time during the quarter they are submitted. (*Id.* at 132.) The nurse checks the form under review against the video record captured by surveillance cameras. (*Id.* at 8.) A nurse noticed inconsistencies between Ramirez's entries and the timestamps on the video for one of the cells he was supposed to be monitoring. (*Id.*) The Assistant Chief of Security, David Running, was alerted, and he determined that Ramirez falsified four 13-63A form entries. (*Id.*) Thus, Chief Running began a more detailed investigation. (*Id.* at 8, 132, 268–70; Doc. 1 at 7.)

Chief Running asked Ramirez about the false entries, and Ramirez told him that he was busy; he did not mention his vertigo. (Doc. 1 at 9–10; Doc. 1-2 at 363.) On April 16, 2019, Warden Kristopher Kline fired Ramirez for "failure to follow procedures, misconduct related to safety and Security, Misconduct related to job performance, and violation of the '[CBA] rules.'" (Doc. 1-2 at 472; *see id.* at 15, 17.) Specifically, CoreCivic's internal investigation found that Ramirez "failed to perform required duties pertaining to close observation safety and welfare checks of a CAFCC at-risk detainee housed in the facility's [RHU] on suicide precautions" and "falsified four written entries on official records in an attempt to cover up his failure to perform his suicide prevention related duties." (Doc. 1 at 2–3.)

Thereafter, the Union filed a grievance seeking to have Ramirez reinstated with a one-day suspension based on the discipline other officers had received. (Doc. 1-2 at 10.) The Union alleged that just cause for the termination did not exist and that Ramirez received disparate treatment because he was a Union member.[1] (Doc. 1 at 5.)

---

[1] The Parties' briefs' characterizations of the nature of the grievance are inconsistent. CoreCivic's Petition claims, "[t]he Union's grievance did not contest the circumstances upon which the discipline was based, i.e., that [Ramirez] failed to perform required close observation safety checks and falsified records indicating that the checks had been performed. Rather, the Union challenged the penalty alone, claiming [Ramirez's] termination was inconsistent with discipline issued to other correctional officers who committed a similar offense. The grievance sought to have the termination reduced to a one-day suspension." (Doc. 1 at 6; *see also* Doc. 9 at 6–7.) But the Union claims it "filed and pursued a grievance alleging that just cause did not exist for [Ramirez's] termination to arbitration, which occurred on September 22, 2020 before Arbitrator Mayne." (Doc. 9 at 6–7.) Despite this conflict in the briefing, the arbitrator's opinion clearly outlines that *both* Parties' issue statements filed before arbitration included a question about whether

### C. The Arbitration Hearing and Award

The relevant portions of the CBA governing the grievance and arbitration procedures and relating to this dispute include Article 7 ("Management Rights"), Article 16 ("Discipline and Discharge"), and Article 17 ("Grievance and Arbitration"). (Doc. 1-2 at 25–26, 29–31.) Specifically, Article 7, Section 1c reserves to CoreCivic the "right to discipline, suspend or discharge [employees] for just cause." (*Id.* at 25.) In Article 7, Section 2, CoreCivic "retains the right to establish and enforce work rules and policies . . . ." Furthermore, "[w]ork rules and policies set out in [the CBA] or in existence at the time of the [CBA] are presumed reasonable, in contract conformity, and just cause for discipline." (*Id.*) Article 16, Section 1 establishes that "[e]mployees shall be subject to discipline, suspension, or discharge for just cause including, but not limited to, violations set out in the Work Rule Appendix to [the CBA]." (*Id.* at 29.) Additionally, "[i]t is expressly understood and agreed that just cause for discharge or other discipline is by no means limited to" those reasons. (*Id.*) Article 16, Section 4 outlines CoreCivic's policy of "progressive discipline" but maintains that "the appropriate penalty shall be at the discretion of [CoreCivic]." (*Id.*)

Article 17, Section 5b outlines that, in an arbitration, the arbitrator "shall have no power to substitute [her] discretion in cases where [CoreCivic] has retained discretion or has been given discretion by [the CBA]." (*Id.* at 31.) Article 17, Section 5b also maintains that "[t]he arbitrator selected in accordance with the above procedure shall decide the dispute and [her] decision shall be final and binding on [CoreCivic], the Union, and [Ramirez], provided the arbitrator shall only have authority to decide if [CoreCivic] violated the express terms of [the CBA]. [Sh]e shall have no authority to add to, subtract from, supplement or modify [the CBA] in any way." (*Id.*) Additionally, Article 17, Section 5e establishes:

> In arbitrations which involve discipline for inappropriate relationships or conduct of business with an inmate or inmates or introduction of contraband to the Prison, theft, or positive

---

CoreCivic had "just cause to terminate [Ramirez]." (Doc. 1-2 at 6.)

- 4 -

> drug or alcohol test, as defined by the applicable substance abuse testing policy, the arbitrator's authority shall be limited solely to a determination of whether or not the employee actually committed the act or acts for which he was disciplined and, absent a finding of unreasonableness by the Arbitrator, the Employer's decision of the kind and degree of discipline shall not be disturbed. *In all other matters of Employer discipline, the arbitrator shall determine the circumstances upon which the discipline was based and if the circumstances were substantially as found by the Employer, the discipline will not be disturbed absent an express finding of unreasonableness.*

(*Id.* (emphasis added)) Thus, the CBA outlines one standard—just cause—which automatically warrants disciplinary action. (*See* Doc. 1-2 at 25–26, 29–31.) Some actions, like violating work rules, are deemed automatic grounds for just cause. (*See id.*) The arbitrator can review discipline levied by CoreCivic based on this just cause standard. (*See id.*) But in the CBA, CoreCivic bargained for and reserved discretion regarding disciplinary actions it takes "absent an express finding of unreasonableness" by the arbitrator. (*Id.* at 31; *see id.* at 25–26, 29–31.)

Pursuant to the CBA's terms, the grievance was taken to arbitration on September 22, 2020. (*Id.* at 5.) The Parties selected an arbitrator, Renee Mayne, to preside over a dispute involving the termination of Ramirez. (*Id.*) The Union represented Ramirez at the arbitration. (*Id.*) The arbitrator considered testimony she heard from several witnesses, the evidence submitted in the arbitration, and the briefing the parties submitted before and after the arbitration before determining the arbitration award. (*See id.* at 4–19.)

On December 11, 2020, the arbitrator issued her award. (*Id.* at 2–20.) She found that Ramirez's conduct was serious, violated CoreCivic's policies and the CBA, and confirmed many of the facts on which CoreCivic based its punishment. (*See id.*) But in light of mitigating circumstances such as Ramirez's good work record and his medical history, she determined CoreCivic did not adequately prove it had just cause to terminate Ramirez because his confession without video evidence did not establish just cause for termination. (*See id.* at 17–18.) The award hinged on two material factors. First, the arbitrator provided

much weight to Ramirez's explanation that he did not tell Chief Running about his vertigo on March 29. (*Id.* at 289–90.) Ramirez said nothing because he believed his prior good work record would prevent him from being fired and reporting the accommodation rejection would make his supervisor look bad. (*Id.*) Instead of reporting his supervisor's decision to reject his accommodation, he wanted a light punishment. (*Id.*) Second, although video evidence existed, CoreCivic did not to use it at the arbitration. (*Id.* at 11.) The video showed that Ramirez had failed to make his required detainee checks and instead had falsified evidence. (*Id.* at 11; Doc. 11 at 7.) CoreCivic previously indicated in an internal investigation report that the video recording was the key piece of evidence that it considered when deciding on Ramirez's punishment. (Doc. 1-2 at 11.) Although she determined that there was insufficient evidence to fire Ramirez, she also decided that there was just cause to for a one-day suspension. (*Id.*) She reduced his discipline from termination to a one-day suspension. (*Id.* at 18.)

   **D.** **CoreCivic's Petition to This Court**

   CoreCivic filed its Petition with this Court claiming the arbitrator "ignored the plain and unambiguous language of the [CBA], exceeded the scope of her authority, and violated public policy by ordering" Ramirez's reinstatement. (Doc. 1 at 10.) The Union responded with the instant Motion to Dismiss. (Doc. 9.)

**II.** **STANDARD OF REVIEW**

   **A.** **Motion to Dismiss**

   A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief" such that the defendant is given "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 545, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2); *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A complaint does not suffice "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). Dismissal under Rule 12(b)(6) "can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."

*Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). A complaint, however, should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle it to relief." *Williamson v. Gen. Dynamics Corp.*, 208 F.3d 1144, 1149 (9th Cir. 2000).

The Court must accept material allegations in a complaint as true and construe them in the light most favorable to Plaintiffs. *North Star Int'l v. Arizona Corp. Comm'n*, 720 F.2d 578, 580 (9th Cir. 1983). "Indeed, factual challenges to a plaintiff's complaint have no bearing on the legal sufficiency of the allegations under Rule 12(b)(6)." *See Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). Review of a Rule 12(b)(6) motion is "limited to the content of the complaint." *North Star Int'l*, 720 F.2d at 581.

### B. Vacating an Arbitration Award

"The cardinal precept of arbitration is that it is 'simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration.'" *Loc. Joint Exec. Bd. v. Mirage Casino-Hotel, Inc.*, 911 F.3d 588, 595 (9th Cir. 2018) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 947–48 (1995)). Section 301 of the Labor Management Relations Act ("LMRA § 301"), 29 U.S.C. § 185 *et seq.*, grants this Court jurisdiction to vacate or enforce an arbitration award issued pursuant to a collective bargaining agreement. *See, e.g.*, *Sprewell v. Golden State Warriors*, 266 F.3d 979, 986 (9th Cir. 2001) (citing *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593 (1960)). "[B]ecause federal labor policy strongly favors the resolution of labor disputes through arbitration," *United Food & Commercial Workers Int'l Union, Local 588 v. Foster Poultry Farms,* 74 F.3d 169, 173 (9th Cir.1995), *as amended* (cleaned up), "judicial review of an arbitration award is both limited and highly deferential." *Sheet Metal Workers' Int'l Ass'n Loc. Union No. 359 v. Madison Indus., Inc.*, 84 F.3d 1186, 1190 (9th Cir. 1996).

"Arbitration awards are ordinarily upheld so long as they represent a plausible interpretation of the contract." *Aramark Facility Servs. v. Serv. Emps. Int'l Union, Local 1877*, 530 F.3d 817, 823 (9th Cir.2008) (internal quotation marks omitted). Indeed, "as

long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *United Paperworkers' Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987); *see also San Francisco–Oakland Newspaper Guild v. Tribune Pub. Co.,* 407 F.2d 1327, 1327 (9th Cir.1969) (per curiam) ("[S]o far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him, because their interpretation of the contract is different than his."). Judicial review of an arbitrator's award is limited and deferential because "[i]t is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." *Federated Dep't Stores v. United Foods & Com. Workers Union, Loc. 1442*, 901 F.2d 1494, 1496 (9th Cir. 1990) (citing *Enter. Wheel*, 363 U.S. at 599). The Court is tasked with "determin[ing] whether the arbitrator interpreted the collective bargaining agreement, not whether [the arbitrator] did so correctly." *Hawaii Teamsters & Allied Workers Union, Local 996 v. United Parcel Serv.*, 241 F.3d 1177, 1178 (9th Cir. 2001) (citing *Stead Motors of Walnut Creek v. Auto. Machinists Lodge No. 1173*, 886 F.2d 1200, 1204 (9th Cir.1989) (en banc).

Generally, courts have recognized four occasions that merit vacating an arbitration award: "(1) when the award does not draw its essence from the collective bargaining agreement; (2) when the arbitrator exceeds the scope of the issues submitted; (3) when the award runs counter to public policy; and (4) when the award is procured by fraud." *Sprewell*, 266 F.3d at 986. CoreCivic challenges the arbitration award under the first three exceptions. (Doc. 1 at 11–12.)

### III. DISCUSSION

#### A. Waiver to Argue for a No-Discretion Standard

For the first time in its reply brief, the Union argues that CoreCivic raises the no-discretion standard as a justification for vacating the arbitration award. (Doc. 12 at 2.) The Union asserts that CoreCivic asked the arbitrator "to apply a normal discretionary just

- 8 -

cause analysis" in its opening statement during the arbitration, and did not argue for a no-discretion standard in its post-hearing brief. (Doc. 12 at 2–3.) But here, according to the Union, CoreCivic argues for a no discretion standard "under which it has complete discretion to determine the severity of a penalty for any proven violation." (*Id.* at 3.)

CoreCivic disagrees. (*See* Doc. 17 at 2–6.) It argues that it has consistently maintained that if the arbitrator found that it had just cause to punish Ramirez, then the arbitrator did not have the discretion to change the penalty without making an express finding of unreasonableness. (*See id.*) CoreCivic cites to multiple excerpts from the Petition, its post-hearing brief, and its arguments during the arbitration hearing. (*See id.*)

"In general, federal courts do not permit a party to withhold an issue or argument during arbitration and then, upon losing, raise it to the reviewing court." *Boehringer Ingelheim Vetmedica, Inc. v. Food and Commercial Workers Dist. Local 2*, 739 F.3d 1136, 1140 (8th Cir. 2014). Parties "cannot stand by during arbitration, withholding certain arguments, then, upon losing the arbitration, raise such arguments in federal court. We will not tolerate such sandbagging." *Nat'l Wrecking Co. v. Int'l Bhd. of Teamsters, Local 731*, 990 F.2d 957, 960 (7th Cir. 1993).

In a twist of irony, the Union fails to explain why this Court need address its arguments at all as, typically, "arguments raised for the first time in a reply brief are waived." *Graves v. Arpaio*, 623 F.3d 1043, 1048 (9th Cir. 2010). Regardless, the Court will consider the merits and finds that CoreCivic has not waived the argument that the arbitrator failed to make an express finding of unreasonableness—the only way CoreCivic's discretion to discipline an employee can be disturbed. (*See* Doc. 17 at 3–6.) The Union's argument that CoreCivic is trying to change the standard from just cause to no-discretion is simply not supported by the record.

**B.    Scope of the Issues Submitted**

"[A]n arbitrator's interpretation of the scope of the issue submitted to [her] is entitled to the same deference accorded [her] interpretation of the [CBA]." *Pack Concrete, Inc. v. Cunningham*, 866 F.2d 283, 285 (9th Cir. 1989). Indeed, "the scope of the

- 9 -

arbitrator's jurisdiction extends to issues not only explicitly raised by the parties, but all issues implicit within the submission agreement." *Schoenduve Corp. v. Lucent Techs., Inc.*, 442 F.3d 727, 733 (9th Cir. 2006).

CoreCivic argues that reducing Ramirez's punishment was not an issue presented because CoreCivic had just cause to discipline Ramirez and the arbitrator never made the express finding of unreasonableness necessary to adjust CoreCivic's disciplinary decision. (*See* Docs. 1, 11, 17.) CoreCivic asserts that under Article 16, Sections 1 and 4, it, by definition, had just cause to terminate Ramirez because he violated a work rule when he falsified records. (*See* Doc. 11 at 5–6.) And so, CoreCivic argues, the CBA only permitted the arbitrator to reduce Ramirez's punishment if she expressly found that it was unreasonable, which she did not. (*See id.* at 6–7.) Thus, CoreCivic argues, the arbitrator went beyond the scope of the issues presented when she considered mitigating evidence, and by reducing the disciplinary sanction without making the required finding. (*See id* at 8–11.)

The Union argues that the mitigating factors were within the scope of the issues presented because it alleged that CoreCivic had failed to properly accommodate Ramirez's medical issues. (Doc. 9 at 13.) The Union also observes that "[CoreCivic's] claim that [the] [a]rbitrator . . . exceeded the scope of her authority in issuing the Opinion and Award mirrors its claim that her award did not draw its essence from the CBA." (*Id.* at 12.) Indeed, CoreCivic's own briefs do not contest that if the arbitrator had made an express finding of unreasonableness, then the arbitrator would have been able to reduce Ramirez's penalty. (*See* Docs. 11, 17.)

Whether the arbitrator was allowed to consider evidence that CoreCivic did not know, but could have learned about, when deciding if CoreCivic's disciplinary action was reasonable is a question of contract interpretation. This Court must defer to the arbitrator's interpretation of the CBA regarding what evidence she could and could not consider when determining if CoreCivic had just cause. In fact, CoreCivic's argument implicitly accepts that the issue of penalty reduction was properly before the arbitrator because it agrees that

the arbitrator could have reduced Ramirez's discipline if she made an express finding of unreasonableness. (*See, e.g.*, Doc. 11 at 6; Doc. 17 at 6.) Even if, as CoreCivic argues, the arbitrator never made that express finding, it does not mean the award was beyond the scope of the issues presented. The arbitrator was always empowered by the CBA to make such a decision if the proper conditions were satisfied. For these reasons, the Motion to Dismiss will be granted regarding the Petition's claims that the arbitrator acted beyond the scope of the issues presented.

### C. Essence of the CBA

An arbitration "award is legitimate only so long as it draws its essence from the collective bargaining agreement." *Enter. Wheel*, 363 U.S. at 597. "An award draws its essence from the CBA when it is based on language in the CBA." *SFIC Properties, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. Lodge 94, Loc. Lodge 311*, 103 F.3d 923, 925 (9th Cir. 1996). Federal courts will set aside an arbitration award "for failing to draw its essence from the contract in 'those egregious cases in which a court determines that the arbitrator's award ignored the plain language of the contract.'" *Sprewell*, 266 F.3d at 986–87 (quoting *Stead Motors of Walnut Creek*, 886 F.2d at 1205–06 n. 6). "In interpreting the contract, the arbitrator is not bound by precedent or by the record before [her] . . . ." *Sheet Metal Workers' Int'l Ass'n Loc. Union No. 359*, 84 F.3d at 1190.

CoreCivic argues that the arbitrator "only possessed authority to decide if CoreCivic violated the express terms of the Agreement." (Doc. 11 at 3.) CoreCivic asserts that under the CBA it had just cause to discipline Ramirez up to and including termination because he violated work rules.[2] (*Id.* at 3–4; *see id.*) And so, CoreCivic argues that the arbitrator exceeded her authority from the CBA by reducing the penalty imposed on Ramirez despite meeting the standard for just cause. (*See id.* at 4–11.)

CoreCivic also argues that the terms of the CBA unambiguously limit the arbitrator's power to modify the penalty imposed such that the arbitrator would need to make an express finding that the penalty was unreasonable to modify the penalty imposed.

---

[2] CoreCivic notes that whether Ramirez violated work rules is not disputed by the Parties and that he admitted he failed to perform his duties and then falsified records. (*Id.* at 4.)

- 11 -

(*See id.* at 5–6.) Specifically, CoreCivic argues first that Article 17, Section 5b provides that "the arbitrator 'shall have no power to substitute their discretion' in cases where CoreCivic has retained discretion or has been given discretion by the [CBA];" second, the Parties do not "dispute that CoreCivic retained the discretion to 'discipline, suspend or discharge for just cause'" under Article 7, Section 1c; third, Article 16 grants CoreCivic sole discretion "to set the appropriate disciplinary penalty for policy infractions;" and fourth, Article 17, Section 5e "provides that in matters of discipline such as the underlying arbitration, if the arbitrator determines the factual circumstances upon which the discipline was based were substantially as found by CoreCivic, 'the discipline will not be disturbed absent an express finding of unreasonableness.'" (*See id.*) But, CoreCivic argues, the arbitrator never made that express finding. (*See id.*) It also argues that the mitigating factors considered by the arbitrator do not constitute an express finding of unreasonableness and do not justify the arbitrator disregarding the express language of the CBA which requires such a finding. (*See id.* at 8–11.) Thus, the award deviates from the essence of the CBA. (*Id.* at 7–8.)

CoreCivic finally argues that the only issue in dispute between the parties is whether the arbitrator had the ability to reduce Ramirez's punishment. (Doc. 17 at 6–7.) CoreCivic asserts that the arbitrator did not make an express finding of unreasonableness and so the award should be vacated. (*See id.* at 7–8.)

According to the Union, the arbitrator "was not required to make an express finding that the disciplinary penalty was unreasonable in order to disturb the penalty imposed by the Employer." (Doc. 9 at 11.) The Union also argues that the arbitrator's "determination that [CoreCivic] lacked just cause to terminate [Ramirez] is a plausible interpretation of the CBA." (*Id.*) While CoreCivic was permitted to terminate employees for just cause and has the sole discretion to determine the appropriate penalty when punishing an employee, the Union argues that the arbitrator determined that CoreCivic "did not establish just cause for termination primarily because the video evidence was not introduced to dispel the Union's argument that mitigating circumstances existed." (*Id.*)

The Union also argues that Article 16 of the CBA does not give CoreCivic sole discretion to discipline employees. (Doc. 12 at 4–5.) Instead, the Union asserts, under Article 16, CoreCivic was only empowered to punish employees for "'just cause,' which by nature allows the [a]rbitrator discretion to review the Company's decision." (*Id.* at 5.) The Union then notes that while the CBA never grants CoreCivic sole discretion, it does mention the concept of progressive discipline. (*Id.*) Progressive discipline is the concept "that discipline starts with a small citation that gradually increases for further disciplinary violations." (*Id.*)

The Union also asserts that the CBA provides that the arbitrator has the authority to change the punishment levied if the arbitrator makes a finding of unreasonableness. (*Id.* at 6–7.) Thus, the Union argues, the CBA clearly gives the arbitrator the "discretion to reverse [Ramirez's] termination if she finds the circumstances different than that presented by CoreCivic or if she found CoreCivic's discipline of [Ramirez] unreasonable." (*Id.* at 7.) Here, the Union argues that the award should be upheld because "the [a]rbitrator both disagreed with the circumstances found by Core[C]ivic, and found Core[C]ivic's decision to terminate unreasonable." (*Id.* at 7; *see id.*)

Under the CBA, CoreCivic had just cause to discipline Ramirez up to and including termination because he violated work rules. (Doc. 11 at 3–4.) Even though CoreCivic had just cause to terminate Ramirez, under Article 17, Section 5e, the arbitrator still had the authority to reduce the punishment CoreCivic levied upon an express finding of unreasonableness. (Doc. 1-2 at 31.) In her decision, the arbitrator notes that (1) Ramirez's "admission is insufficient to prove just cause for his discharge;" (2) if video evidence of Ramirez failing to perform his checks had been presented, the mitigating factor of his recent surgery might have been dispelled; and (3) "[w]ithout the video evidence, [CoreCivic's] case to prove just cause was significantly impaired." (*Id.* at 18.) The arbitrator concludes that "there was insufficient evidence to terminate [Ramirez] for falsifying rounds documentation during his scheduled shift, but there was just cause for a one-day suspension without pay." (*Id.*) But the arbitrator never explicitly states in her

opinion that CoreCivic's punishment was unreasonable. (*See id.*)

Although this Court exercises a highly deferential standard, an arbitrator cannot flatly ignore the plain language of the CBA. Here, the CBA leaves no room for error or interpretation. If circumstances were substantially as found by CoreCivic, the CBA requires the arbitrator to make an express finding of unreasonableness in order to reduce the discipline CoreCivic levies on an employee. (*See id.* at 31.) The arbitrator did not make an express finding of unreasonableness in her written award. Instead, she found that CoreCivic lacked just cause to terminate Ramirez and then reduced the punishment. This analysis fails to draw its essence from the CBA for two reasons.

First, the CBA expressly names a violation of work rules as just cause for punishment up to and including termination. (*Id.* at 25, 29.) But the question here is *not* whether just causes exists. The arbitrator's statement that there was not just cause to fire Ramirez is an egregious case of ignoring the CBA's plain language. Second, the arbitrator found the circumstances to be substantially as found by CoreCivic at the time of discipline by confirming that Ramirez had in fact violated work rules. (*Id.* at 17–18.) Thus, the arbitrator needed to make an express finding of unreasonableness in order to reduce Ramirez's punishment. Instead of making that finding, the arbitrator focused on mitigating factors that, according to the arbitrator, undermined CoreCivic's position that the termination decision was supported by just cause. Such findings might imply that the arbitrator believed that CoreCivic's actions were unreasonable. But an express finding is not an implied conclusion. The CBA requires more. As counsel emphasized at oral argument, this Court must be highly deferential to an arbitrator's interpretation of a CBA. But this Court cannot ignore the CBA's plain language. Express cannot mean implied. The arbitrator's award deviates from the plain language of the CBA. CoreCivic's petition therefore states a claim under LMRA § 301, 29 U.S.C. § 185 *et seq.*

**D.   Public Policy**

"To vacate an arbitration award on public policy grounds, [a court] must (1) find that 'an explicit, well defined and dominant policy' exists here and (2) that 'the policy is

one that specifically militates against the relief ordered by the arbitrator.'" *Sprewell*, 266 F.3d at 987 (citing *UFCW Local 588*, 74 F.3d at 174). "Any such public policy 'must be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *Matthews v. Nat'l Football League Mgmt. Council*, 688 F.3d 1107, 1111 (9th Cir. 2012) (citing *E. Associated Coal Corp. v. United Mine Workers of Am., Dist. 17*, 531 U.S. 57, 62 (2000)). Federal regulations can be a significant source for determining public policy. *See S. Cal. Gas Co. v. Util. Workers Union, Local 132*, 265 F.3d 787, 803 (9th Cir. 2001) (citing *UFCW Local 588*, 74 F.3d at 174). But such regulations need to indicate whether they are intended "to preempt already existing [CBAs] or to eliminate an employer's duty to bargain under federal labor laws." *UFCW Local 588*, 74 F.3d at 174. "The party seeking to vacate the arbitration award bears the burden of showing that the arbitration award violates an 'explicit, dominant and well-defined' public policy." *Id.*

CoreCivic argues that certain Federal regulations establish a public policy that the arbitrator's award contravenes.³ (*See* Doc. 1 at 23–26.) Specifically, CoreCivic cites the United States Department of Homeland Security, U.S. Immigration and Customs Enforcement Performance-Based National Detention Standards 2011 ("ICE PBNDS 2011") and the Code of Federal Regulations, 5 CFR § 731.106 ("Designation of public trust positions and investigative requirements"). (Doc. 11 at 11.) ICE PBNDS 2011 outlines a number of compliance obligations and expectations to "protect[] the community, staff, contractors, volunteers and detainees from harm by ensuring that facility security is maintained and events which pose risk of harm are prevented." 2011 OPERATIONS MANUAL ICE PERFORMANCE-BASED NAT'L DET. STANDARDS 81 (2011) https://www.ice.gov/doclib/detention-standards/2011/2-4.pdf. One expectation is that facilities like CoreCivic housing ICE detainees will "develop and document

---

³ The Court acknowledges the Union's argument that the ICE PBNDS 2011 is not a Federal regulation or a proper source where the United States government may articulate public policy positions. (Doc. 9 at 14–15.) For the sake of argument, the Court assumes that CoreCivic's cited sources are legitimate sources capable of articulating Federal public policy.

comprehensive detainee supervision guidelines . . ." and that "information about routine procedures, emergency situations and unusual incidents will be continually recorded in permanent post logs and shift reports . . . ." *Id.* Another is that CoreCivic will develop and document comprehensive detainee supervision guidelines and supervise detainees to prevent them from harming themselves or others. *Id.* at 82. Section 731.106 outlines three levels of risk for each Federal agency position: high, medium, and low. 5 CFR § 731.106(a). "Positions at the high or moderate levels" are considered "public trust" positions. 5 CFR § 731.106(b). "Such positions may involve policy making, major program responsibility, public safety and health, law enforcement duties, fiduciary responsibilities or other duties demanding a significant degree of public trust . . . ." *Id.* "Public [t]rust positions," CoreCivic argues, "require persons not only with the right job skills, but also require a much higher degree of integrity and trustworthiness with unwavering public confidence in the individual occupying the position." (Doc. 1 at 25.) Breaking these guidelines by falsifying records "violated the public trust bestowed on [Ramirez] by the United States federal government as a correctional officer" working for CoreCivic. (*Id.*) By extension, the public puts its trust not only in Ramirez, the correctional officer, but also in CoreCivic, his employer, to properly house detainees. (*See id.* at 23–26.) Thus, as it emphasized during oral argument, the award also violated CoreCivic's duty to the public. (*See id.* at 23–26; Doc. 11 at 11–12.)

Although this this Court must assume all facts alleged in the Petition to be true, this Court also must ensure that the alleged facts show "that the arbitration award violates an 'explicit, dominant and well-defined' public policy." *UFCW Local 588*, 74 F.3d at 174. The Court finds that CoreCivic's Petition does not carry its weighty burden. Federal regulations can be a significant source for determining public policy, but the regulations on which CoreCivic relied do not establish a sufficiently specific public policy rule in these circumstances. *S. Cal. Gas Co.*, 265 F.3d at 803. Broad statements in the Federal Regulations about maintaining the public's trust in correctional officers are far from a specifically articulated public policy that this arbitration award violates. In fact,

CoreCivic's argument presents no logical end to its application. The Court cannot apply CoreCivic's legal theory because it would swallow the narrow *Sprewell* exception. *See, e.g.*, *id.* at 795 (finding that applying a broad public policy argument with no logical end would swallow the narrow rule in *Sprewell*). CoreCivic has not met its heavy burden demonstrating the award violates an explicit, dominant, and well-defined public policy. Thus, the Motion to Dismiss will be granted regarding the Petition's claims that the arbitration award violated public policy.

## IV.   CONCLUSION

Accordingly,

**IT IS ORDERED granting in part** and **denying in part** Respondents' Motion to Dismiss Petitioner's Petition and Motion to Vacate Arbitrator's Award under Fed. R. Civ. P. 12(b)(6) (Doc. 9).

**IT IS FURTHER ORDERED** that the Petition's claims that the arbitrator acted beyond the scope of the issues presented and that the arbitration award violate public policy are dismissed with prejudice.

**IT IS FURTHER ORDERED** that the Petition's claims that the award did not draw its essence from the CBA shall remain.

Dated this 9th day of February, 2022.

*Michael T. Liburdi*
Michael T. Liburdi
United States District Judge